People v Ruiz (2024 NY Slip Op 24174)

[*1]

People v Ruiz

2024 NY Slip Op 24174

Decided on June 18, 2024

Supreme Court, Kings County

Daniels-DePeyster, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on June 18, 2024
Supreme Court, Kings County

People of the State of New York

against
Reginaldo Ruiz, Defendant

Ind. No. 75698-22

ADA Danyelle Shapiro and ADA Gabrielle Tielman-Fenelus for DA Eric Gonzalez, Kings County, District Attorney's Office
Larry Rothstein for the defendant

Claudia Daniels-DePeyster, J.

The defendant is charged with Attempted Murder in the Second Degree (Penal Law § 110/125.25[1]) and other related charges. On June 12, 2024, this Court conducted a Mosley hearing to determine if New York City Police Department (hereinafter "NYPD") Officer Triston Trunk, a non-eyewitness to the charged crime, would be permitted to testify before the jury that the defendant, Reginaldo Ruiz, is the person depicted in video surveillance.
I. People v. Mosley
The Court of Appeals recently addressed this very issue in the matter of People v. Mosley ( N.E.3d , 2024 WL 1723074 [NY], 2024 NY Slip Op. 02125), delineating the two-prong test to be used in a pre-trial hearing to allow a trial judge to determine whether the offered testimony will help the jury independently determine if the person in the video recording is the defendant. As of the date of this decision, this Court can locate no published decisions from trial courts that have conducted a Mosley hearing. Therefore, it is crucial to outline the facts and history of the case to provide context and guidance for future cases that may reference this precedent.
A. The Underlying Facts
On June 10, 2015, police cameras in Syracuse, New York, captured a video of a man running through the street and shooting at a van. In September 2015, Farod Mosley was indicted for the shooting. That indictment, however, was later dismissed as legally insufficient. In July 2016, as the prosecution prepared to re-present the charges against Mosley, they showed the video of the shooting to Detective Steven Kilburn, a homicide detective. Detective Kilburn identified Mosley as the shooter in the video and repeated his identification to a grand jury, leading to Mosley's re-indictment.
At Mosley's trial in February 2018, the primary issue was the identity of the shooter in the video. The evidence at the trial was limited to the video and Detective Kilburn's identification testimony, as other witnesses did not see the shooter, and no forensic evidence linked Mosley to the crime. Detective Kilburn first testified to his familiarity with Mosley outside the jury's presence. He stated that he first met Mosley around seven months after the [*2]crime when Mosley was brought to the precinct as a suspect in another crime. By the time of the trial, he estimated having known Mosley for about a year to a year and a half. During that period, he had been in the same room with Mosley several times but could only recall one specific face-to-face encounter. He did not remember any interactions with Mosley on the street. After his testimony, the court concluded that the detective had "an extensive basis of knowledge" to identify Mosley in the video but instructed him not to mention the unrelated criminal investigation for which Mosley had been arrested (People v. Mosley, 200 AD3d 1658, 158 N.Y.S.3d 511 [2021], rev'd, No. 23, 2024 WL 1723074 [NY Apr. 23, 2024]).
Kilburn told the jury he knew Mosley from his routine work in the neighborhood and described his familiarity with Mosley's physical characteristics. However, he admitted that the video showed only a blurry figure. The jury reviewed the footage and Kilburn's testimony before convicting Mosley of weapon possession and reckless endangerment.

B. The Court of Appeals' Finding
Mosley appealed, arguing that Detective Kilburn's testimony was improperly admitted. The Appellate Division, with a divided opinion, upheld the conviction. However, the Court of Appeals reversed the decision and ordered a new trial, finding that adding Detective Kilburn's testimony was an abuse of discretion. In reversing, the Court of Appeals found that the People did not establish that Detective Kilburn "was sufficiently familiar with Mosley to render his identification helpful to the jury" (Mosley at 4). Specifically, they found that Kilburn's interactions with Mosley were vague and unspecified; he testified only to limited and unclear interactions and did not meet Mosley until seven months after the shooting (id. at 4). Additionally, the detective did not know what Mosley was wearing on the day of the shooting and failed to identify any unique traits of Mosley's appearance that could be connected to the surveillance photo (id.).
The Court further found that "the People failed to demonstrate that the jury needed Kilburn's help" (id. at 4). Specifically, they noted that the person in the video was not disguised, and Mosley's appearance had not changed, suggesting that the jury could identify Mosley as well as Detective Kilburn could. They also noted that the video was "so blurry" that it was impossible for anyone to make out a face and that Detective Kilburn's identification was based on repeated viewings and zooming in on the footage, which did not provide any advantage over the jury's ability to make the same identification from the evidence presented (id. at 4).

II. The 
 Mosley Hearing
In making their findings, the Court of Appeals noted that "[t]he admission of Kilburn's testimony in this case illustrates the challenges of cross-examination inherent in lay opinion identification testimony from law enforcement" (Mosley at 6). They went on to note that "[a]lthough use of such testimony may be warranted in certain circumstances, courts must be vigilant that the testimony does not unnecessarily invade the jury's role" (Mosley at 1)(internal citations omitted). Therefore, for a trial judge to determine if the offered testimony will assist the jury in independently assessing whether the person in the video recording or photo is the defendant, the court must apply a two-prong totality of the circumstances test to determine whether the lay witness is more likely than the jury to correctly identify the defendant from the video recording (see Mosley at 2-3). The burden is on the party offering the witness to establish that "their testimony would both be helpful and necessary" (Mosley at 3).
A. Prong One: Is the witness sufficiently familiar with the defendant that their testimony would be reliable?
As to the first prong, the court must assess the lay witness's level of familiarity with the defendant. To determine this, the court can consider the following:
(1) a witness's general level of familiarity with the defendant's appearance; (2) whether the witness's familiarity spanned an extended period of time and variety of circumstances; (3) whether the witness was familiar with the defendant's appearance at the time of the surveillance footage was taken; (4) the witness's familiarity with the defendant's customary manner of dress or clothing on the day of the surveillance footage; and (5) whether the witness testified about a specific trait the defendant has and whether the witness identified that trait in the surveillance footage.
(Barry Kamins, Lay Opinion Identification Testimony: The New 'Mosley' Hearing [June 03, 2024, 10:00 AM] 
https://www.law.com/newyorklawjournal/2024/06/03/lay-opinion-identification-testimony-the-new-mosley-hearing/; see Mosley at 2-3).
If the court does not find that the lay witness has sufficient familiarity with the defendant, then that would be the end of the inquiry, and the witness would not be permitted to testify before the jury that the person depicted in the photograph or video is the defendant. If the court finds that the lay witness has sufficient familiarity with the defendant, they must consider the second prong.
B. Prong Two: Is there reason to believe the jury might require such assistance in making its independent assessment?
Regarding the second prong, the court must determine whether the jury needs the lay witness's assistance. In making this determination, the court can consider the following:
(1) whether the defendant's appearance changed between the time of the surveillance footage and the trial or whether the defendant disguised himself in the surveillance footage; and (2) the quality of the surveillance footage and the extent to which the subject is clearly captured in the frame.
(Kamins, supra; see Mosley at 2-3).
If the court finds that the jury does not need the assistance of the lay witness in making an independent assessment, then the witness would not be permitted to testify before the jury that the person depicted in the photograph or video is the defendant. If the court finds that the jury needs the lay witness's assistance, then "the trial court should provide cautionary jury instructions that this type of testimony is mere opinion testimony that they may choose to accept or reject. The instructions should be given both at the time of the testimony and during the final charge" (Kamins, supra; Mosley at 3; see also People v. Laroc, 203 AD3d 1176 [2d Dept, 2022](noting that "the court gave appropriate limiting instructions during the trial testimony and the court's final charge to the jury was comprehensive and accurate"); see also People v. Lee, 214 AD3d 457, 458 [2d Dept, 2023) ("prejudice to defendant was minimized by the court's repeated instructions reminding the jury that it was its function to determine who was depicted [*3]on the video"))[FN1]
.

 III. Findings of Fact
Here, the People intended to have Officer Trunk testify that he knew the person depicted in the surveillance video to be the defendant, Reginaldo Ruiz. As such, this Court conducted a Mosley hearing outside the jury's presence to determine the admissibility of such testimony. At the hearing, the People called Officer Trunk, who testified that he had been employed by the NYPD for approximately nine-and-a- half years (Tr. at 250). He indicated that on September 18, 2022, he was working as a detective with the field intelligence unit when he received a phone call from "Reggie Ruiz" whom he identified at the hearing as the defendant (hereinafter "Mr. Ruiz) (Tr. at 250-252, 255). He knew it was Mr. Ruiz who called because the caller said "hey, it's me, Reggie," and because he had previously spoken to Mr. Ruiz with the same phone number (Tr. at 252, 256).
Officer Trunk testified that he has known Mr. Ruiz since he became an officer (Tr. at 264). Before September 18, 2022, he and Mr. Ruiz had spoken on the phone "approximately five times," each call being "a few minutes long" (Tr. at 252-253). They also had approximately ten face-to-face interactions, with the longest interaction being "more or less 30 minutes," during which nothing was obstructing Officer Trunk's view of Mr. Ruiz (Tr. at 253-254, 275). These interactions included "hi's and byes" "through the streets in passing," which lasted "less than a minute" (Tr. at 278, 284). During one of these interactions, Mr. Ruiz went to the 71 Precinct. He told the officer that "he was aware of a firearm in the vicinity of where he lived, Ebbett's Field complex, and that he would surrender the gun and drop it at a location and then call" to tell the officer where the firearm was (Tr. at 255-256, 278-279). This interaction lasted "approximately 30 minutes" (Tr. at 283).
In viewing video surveillance from the incident, Officer Trunk said he knew it was the defendant because of "his facial features" "like his nose, his hair, the shape of his face" and his stature (Tr. at 274-275). He said, "I know how he walks, I know what he looks like. I'm used to seeing him" (Tr. at 275).

 IV. Conclusions of Law
Regarding the first prong, the Court finds that Officer Trunk is sufficiently familiar with the defendant that his testimony would be reliable. Specifically, prior to September 18, 2022, Officer Trunk knew Mr. Ruiz for approximately eight years. During that time period, Officer Trunk and Mr. Ruiz had approximately five phone conversations and ten face-to-face interactions, one of which lasting up to thirty minutes. Additionally, Officer Trunk testified that he recognized the defendant's nose, hair, the shape of his face, and the way he walked (see People v. Lee, 214 AD3d 457, 458 [2023]("The witness testified that he had seen the defendant several times a week in the months leading up to the shooting, he was friends with defendant's brother, and they often socialized").
Regarding the second prong, the Court finds that the jury does not require assistance in making its independent assessment. Specifically, the male's appearance from the time of the surveillance video to the trial had not changed, and even his haircut was the same. The [*4]individual in the video can be seen walking around over an extended period of time with different angles of his face toward the camera at various times. Moreover, he was not disguised in the surveillance video. Given the video's clarity, the jury would be as well suited as any other person to make an identification from the surveillance video.
Therefore, Officer Trunk is not permitted to identify Mr. Ruiz on the surveillance video presented by the People as evidence before the jury.
The foregoing constitutes the Decision and Order of the Court.
Dated: June 18, 2024
Brooklyn, NY

Footnotes

Footnote 1:Since the issuance of the Mosley decision, the New York State Unified Court System has published a criminal jury instruction.